## Bixler *v.* Heilman, Appellant.

*Equity—Equity practice—Pleading—Responsive answer.*

1. Where a defendant in an equity suit goes upon the witness stand and his credibility is successfully impeached by evidence of his general reputation for truth and veracity, the force of his answer and the rule in equity as to the sufficiency of proof to overcome a responsive answer, will be satisfied by the positive and satisfactory testimony of one witness to the facts essential to a decree of the relief prayed for, corroborated by other facts and circumstances which give it greater weight than the answer, even though the circumstantial evidence standing alone would not be sufficient to make out every essential to a decree for the plaintiff.

*Deed—Cancellation of deed—Reading deed—Fraud—Evidence.*

2. Where a grantor in a deed prior to executing it says that she could not read it because she did not have her glasses, and the grantee undertakes to read it to her, but does not read it correctly, and the grantor is thereby deceived as to what she is conveying, the deed is voidable at her instance.

Argued Oct. 18, 1910.   Appeal, No. 171, Oct. T., 1910, by defendants, from decree of C. P. Franklin Co., Equity Docket, vol. 3, p. 99, on bill in equity in case of Annie E. Bentz Bixler and S. H. C. Bixler, her husband, v. George M. Heilman.   Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ.   Affirmed.

Bill in equity for cancellation of a deed.

GILLAN, P. J., filed the following adjudication and opinion:

### FINDINGS OF FACTS.

1. On March 26, 1907, the plaintiff, Annie E. Bentz Bixler, became the owner of a lot of ground on east Baltimore street in the borough of Greencastle, about eighty-three and one-half feet and running back to a public alley 240 feet, and was still the owner of it at the time of the hearing in this matter.

2. Prior to March 26, 1908, the defendants became the owners of a lot of ground adjoining the lot of plaintiffs on the east, and were still the owners of it at the time of the hearing in this matter.

3. The plaintiffs and defendants, on March 26, 1908, and prior thereto, lived on their respective properties.

4. The defendant, George M. Heilman, was the owner of an automobile.

5. The plaintiffs' dwelling stands back from the street and is situate on the west side of the lot, covering a space of thirty to thirty-four feet; the east side of the lot adjoining the lot of the defendants was used as a lawn, and covered about fifty feet.   At some time prior there had been a driveway over plaintiffs' lot, but at the time of the occurrences complained of in this bill, and for a long time prior thereto it was not used as a driveway; but it was covered with grass, and was used as part of the lawn, and was being cared for as a lawn.

6. About fifty feet from the street on the plaintiffs' lot

was a building fourteen by sixteen feet, erected as a wood-house and used as an outkitchen.

7. A few days prior to March 26, 1908, while S. C. H. Bixler, one of the plaintiffs and husband of the other plaintiff, was standing on the lawn of their residence, he was approached by George M. Heilman, one of the defendants, and asked whether he would sell this building, saying that he would like to have it for his automobile. Dr. Bixler replied that he had not thought of it, and Heilman said, "If you will give me the privilege of coming in there with my automobile, I will buy it." To this Dr. Bixler replied: "We have been mowing that, my wife enjoys that lawn, we would not like to cut it up." There was some other conversation about moving the shed and moving the fence of the chicken yard, etc. Heilman then said: "You think what you want for it." This ended the conversation.

8. A few days after this Dr. Bixler met Heilman and said to him: "I will sell you that shed for $25.00, and I ought to have a dollar for moving the fences." To this Heilman replied: "All right." In this conversation nothing was said about right of way.

9. Up to this time the plaintiffs and the defendant, George M. Heilman, had been friends; Dr. Bixler was a tenant of George M. Heilman, renting from him the room in which he conducted a drug store.

10. A few days after the last conversation above mentioned George M. Heilman procured a deed to be written, being exhibit "A," and the paper now sought to be canceled. On March 26, 1908, taking with him in his automobile W. A. McKinney, a justice of the peace, he went to the store of Dr. Bixler; they arrived there between two and three o'clock P. M., and passed into the store where Dr. Bixler was engaged with a customer; Heilman approached Bixler, saying he had a paper which he wanted him to sign; that he was in a hurry and wanted to make a train. Dr. Bixler said he was busy; Heilman replied, "It will take only a minute," The customer agreed to

wait, and Dr. Bixler passed to the rear of the store where Heilman handed him exhibit "A." Dr. Bixler read it until he came to the words, "buggy shed and wood-shed," when Dr. Bixler replied that "This is not right." Heilman replied that that was Mr. Patton's mistake. Dr. Bixler said that it was a good deal of writing for a shed, and Heilman said, "I do everything legal." Heilman said that it was all right; Dr. Bixler said, "Between neighbors I trust you." Heilman handed him an indelible pencil and said he was in a hurry, and Dr. Bixler signed the paper. Heilman called the justice and the doctor acknowledged it. The conversation between Heilman and Dr. Bixler was not in the hearing of anyone. Heilman folded the paper on the table before the justice came so that the justice could not read it, saying, that he did not need to know their business.

11. When Heilman told Dr. Bixler that he wanted to catch a train, he did not tell him the truth; he did not intend to take a train; his whole purpose in pretending to be in a hurry was to have Dr. Bixler sign without knowing the contents of the paper.

12. Dr. Bixler did not know that any paper was to be prepared; he did not know when he signed it that it contained a grant of a right of way.

13. Immediately after securing Dr. Bixler's signature, Heilman entered his automobile, taking with him the magistrate, and went to the residence of Mrs. Bixler. Prior to that time the matter of the sale of the wood shed or of any portion of the property had never been mentioned between the plaintiff, Mrs. Bixler, and the defendant; she knew from her husband that he had been talking of selling the wood shed. When they reached the Bixler residence they were admitted to the house by the plaintiff and passed into the reception room; Heilman asked the magistrate to remain in the reception room; and asked Mrs. Bixler to go with him into the dining room. The two passed into the dining room together; Heilman, having closed the door of the dining room, said to her, "Here is a

paper for you to look at," and produced paper exhibit "A." She said, "I have not my glasses." He replied, "Never mind, I will read it for you." He then read it to her; he either did not read the paper correctly or did not read it all, or read it so indifferently that she did not understand it. He then asked her to go with him into the reception room, handed her an indelible pencil, and she, having full confidence in him, signed the paper and acknowledged before the magistrate that it was her act and deed. The defendant, George M. Heilman, made the same representation to her that he was in a hurry to catch a train, which representation was not true. At the time the plaintiff, Annie E. Bentz Bixler, signed paper exhibit "A" she did not know that it contained a provision granting the defendants the right of way over her land. After she had signed it and acknowledged it, Heilman handed her a check for $26.00, with the notation: "In full for shed and right of way." The plaintiff noticed that notation on the check, and when she saw this, it conveyed to her the first information she received that there was any right of way in the transaction. She asked Heilman what it meant, saying she did not understand it. He replied, in substance, that it was for a right of way over her land. She at once accused him of getting it by fraud, told him he had never said anything to her about it, and offered him his check back and demanded the deed; he refused to take the check and refused to surrender the deed. He sent it to the county seat for recording that same day, and it was entered for record the following morning. That same evening Mrs. Bixler sent the check to him by mail; he returned it to her; she produced it in court; it has never been presented for payment. She tendered it to him again in court and the tender was refused; by permission of the court it was filed in the case.

14. At the time these plaintiffs signed exhibit "A" neither of them knew that it contained a provision for a right of way over their lands, and George M. Heilman knew that they did not know it. When he said that he

wanted the shed for his automobile he said what he knew was not true; he wanted it so that plaintiffs could not build next to his property.

15. Neither of the plaintiffs at any time agreed to sell him a right of way over plaintiffs' land.

16. The consideration of $26.00 was wholly inadequate for what he would get by exhibit "A." The right of way was worth at least $250, while the wood shed was worth at least $20.00.

17. The reputation of George M. Heilman for truth and veracity is bad.

18. There is no evidence that the defendants, Alice S. Heilman or Mary F. Heilman, knew anything about this transaction; neither of them filed an answer nor appeared in court, except to have counsel appear and waive service of the bill.

19. The whole transaction was conducted by George M. Heilman, and the conveyance of the right of way was made at his dictation to the three, doubtless because the title to the property adjoining that in which they lived was in the three.

20. Dr. S. H. C. Bixler did not have an opportunity to read the deed before he signed it; that he did not do so was because of George M. Heilman urging that he was in a hurry, and because of his confidence in the said George M. Heilman. George M. Heilman knew that Dr. Bixler had not read it, and knew that he did not know the contents.

21. The purpose of the said George M. Heilman in keeping the contents of the paper from the knowledge of the magistrate was the fear that the magistrate might disclose the contents to the plaintiffs.

22. Dr. Bixler learned of the contents of the check and what had occurred between Heilman and Mrs. Bixler when he went home to supper; he at once sought out Heilman, but failed to find him; he did find him about an hour afterward and asked him to let him see the paper; Heilman replied that he had sent it to Chambersburg.

## CONCLUSIONS OF LAW.

1. The plaintiffs are entitled to a declaration and decree in manner and form as prayed for in their bill.

2. The defendants must pay the costs.

### OPINION OF THE COURT.

A recent writer in a legal publication reports Chancellor Kent as having said, when speaking of his work: "My practice was first to make myself perfectly and accurately (mathematically accurately) master of the facts. It was done by abridging the bill, and then the answers, and then the depositions; and by the time I had done this slow and tedious process, I was master of the cause and ready to decide it. I saw where justice lay, and the moral sense decided the court half the time; and I then sat down to search the authorities. I might once in a while be embarrassed by a technical rule, but I most always found principles suited to my views of the case."

After having considered the bill and answer in this case, heard the testimony of the witnesses, and again having gone carefully over the evidence as written out, I have no doubt where justice lies; the justice of the case is with the plaintiffs. There is no doubt whatever in the mind of the court as to the true facts; there is no doubt whatever in our mind as to the defendant, George M. Heilman, having deliberately planned and successfully carried out a scheme to defraud a nervous, confiding old woman, entirely ignorant of business matters, and an unsuspecting old man of a valuable asset. Is there any technical rule of law which forbids our affording them relief to which in justice and morals they are entitled?

We are met first with the proposition that the answer being responsive to the bill, the plaintiffs can have no relief unless the allegations of the bill are supported by two witnesses, or one witness and corroborating circumstances; the sworn answer of the defendant being equal to one witness, and the burden of proving that she is entitled to the relief prayed for being on the plaintiff, she cannot

prevail unless she can offer more than one witness, or one witness and corroborating circumstances. Does the answer in this case stand as evidence in defendants' favor? The force of the answer may be impeached by evidence showing that the defendant is not to be believed: 3 Greenleaf on Evidence, Lewis' edition, sec. 289. As a general rule, however, extrinsic evidence is not admitted to destroy the effect of an answer by impeaching the credibility of the defendant; the reason for this is, that as the plaintiff makes the defendant his witness by reading his answer, he comes within the operation of the rule that forbids a party to show that his own witness is unworthy of credence: 6 Am. & Eng. Dec. in Eq. 80. The evidence impeaching the credibility of the defendant in this case was admitted without objection. In Maryland the answer is evidence against the plaintiff only when read by him at the hearing: Davis v. Crockett, 88 Md. 249. The plaintiff here did not offer defendant's answer in evidence; it was offered by the defendant himself. It was said by the court of errors and appeals of New Jersey in Morris v. White, 36 N. J. Eq. 324, "Where the defendant does not rely on his answer alone, but offers himself as a witness, the rule that one witness is not sufficient to overcome a responsive answer to a material fact, under oath, is hardly applicable. The rule applies where the reason for it is found. The reason for the adoption of this rule by courts of equity is because, there being a single deposition only against the oath of the defendant in his answer, the denial of facts in the answer is equally strong with the affirmation of them by the deposition: 2 Dan. Ch. Pr. 985; or as it is stated in Gresley's Eq. Ev. 4, this rule has been referred to the equitable principle on which it is grounded, namely, the equal right to credit which a defendant may claim when his oath, positively, clearly and precisely given, and consequently subjecting him to the penalty of perjury, is opposed to the oath of a single witness. But when the witness who opposes the answer is the defendant himself, the reason of the rule fails." The only witnesses in the

case as to the main facts are the two complainants and George M. Heilman, one of the defendants. It is manifest that the witness, McKinney, is mistaken as to the time the conversation to which Mrs. Bixler testified required. The complainants are husband and wife; it is no longer the law in Pennsylvania that, under such circumstances as are presented in this case, husband and wife are to be considered as one witness: Sharp v. Behr, 117 Fed. Repr. 864; Brenneman v. Rudy, 8 Pa. Dist. Rep. 68.

"The testimony of a wife, supporting that of her husband, should at least be accorded the weight of a corroborating circumstance, which is sufficient to satisfy the equitable requirement:" Sharp v. Behr, 117 Fed. Repr. 864.

Regarding the husband and wife, however, as two witnesses, they testify to different occurrences; at no time were the two plaintiffs and the defendant, George M. Heilman, brought together in the transaction. Granting for the sake of argument that we cannot consider that these two complainants, however, fill the requirement of two witnesses, because they did not testify to the same acts of conversations, do we not have circumstances which corroborate each one of them to such an extent as to afford sufficient evidence on which to base a decree for relief? First, as to the inadequacy of price; there is no doubt but that the granting of a perpetual right of way over the plaintiffs' ground would materially decrease the value of it; we have found as a fact, on what we regard as sufficient evidence, that it was worth at least $250. In a town such as this, with such a property as this, it is surprising to the court that a higher estimate was not put upon it. It is said in 2 Pomeroy's Eq. Jurisp., sec. 927: "Although the actual cases in which a contract or conveyance has been cancelled on account of gross inadequacy merely, without other inequitable incidents, are very few, yet the doctrine is settled by a concensus of decisions and dicta that, even in the absence of all other circumstances when the inadequacy of price is so gross that it shocks

the conscience, and furnishes satisfactory and decisive evidence of fraud, it will be a sufficient ground for cancelling a conveyance or contract, whether executed or executory, even then fraud and not inadequacy of price is the true and only cause for the interposition of equity, and the granting of relief." Surely then this inadequacy of price, connected with the other circumstances in this case, are sufficient evidence of fraud upon which to base a decree.

What of the other circumstances of the case? Why was the deed prepared and the magistrate taken to the complainants without any notice? The defendant does not pretend that anything had been said as to the preparation of the deed; the defendant does not say that he had talked the matter over with Mrs. Bixler, the owner of the land, but he says that she wanted to talk with him about it and he refused to talk to her, telling her that he had talked to her husband; yet he had a deed prepared, takes it to the husband, and gets it signed, then goes to the wife and has her sign it in the absence of her husband, and with her husband's signature already obtained. He hands her a check for the consideration. If all the dealings had been with the husband, why was the defendant so particular to hand the check to the wife? What would have been the rational way to proceed if this were an honest transaction? If the defendant had, through the husband, purchased what he claims; if he refused to talk to the wife about it, would he not have discussed with the husband the preparation of the deed? Would he not, when the deed was prepared, have asked the husband when it would suit for the wife to execute it? Would he not have allowed the husband to take it to the wife instead of taking it himself and hurrying her into the execution of it? There is nothing to show any necessity for great haste; there is no necessity for the concealment from the magistrate. After he had secured it, which was between two and three o'clock in the afternoon (having concealed from the magistrate), he, that same evening, sent it to Chambersburg to have spread on the public records. All this, it seems to us, is wholly

inconsistent with the theory of an honest purpose. The fact that the plaintiffs, immediately after the deed was executed, sought to be relieved from it is strong evidence corroborating their statement of what occurred at the time of its execution. While it is true that there may have been no false statements directly made by the defendant to the plaintiffs as to the contents of the paper, yet fraud may be by acts, and when Dr. Bixler said to him, "This is a good deal of writing for a shed," he knew that Dr. Bixler did not know the contents of the paper. When he replied, "I do everything legal," he knew he was saying that which tended to throw the doctor off his guard, and must have been for the purpose of deception. It is not, however, in one specific act, but all together which goes to make up the sum of fraud practiced by the defendant.

We are well aware that, not only by authority, but on principle, a chancellor will more readily refuse to decree a specific performance of an executory contract than to cancel an executed contract. While this contract has been executed and delivered, the defendant has not taken possession of that which he claims to have purchased. A cancellation of the deed will put them in the same position they were before it was executed. Fraud vitiates all contracts, and a deed procured by such means will be set aside.

It is insisted by the defendants with great earnestness that the plaintiffs cannot have relief because they each had an opportunity to read the deed before executing it and did not do it. "If the party that is to sell the deed can read himself and doth not, or being illiterate or blind doth not require the deed read or the contents thereof declared, in these cases, albeit the deed is contrary to his mind, yet it is good and unavoidable:" GIBSON, C. J., in Greenfield's Est., 14 Pa. 489.

Here the owner of the easement purporting to be conveyed stated to the grantee that she could not read because she did not have her glasses, and he undertook to read it to her, but did not read it correctly; therefore, he

is not protected by the above-quoted principle. If the grantors, or either of them, were fraudulently kept in ignorance of the contents of the paper, they are not bound by it: Campbell's App., 80 Pa. 298; Shedwick v. Church, 160 Pa. 57.

### DECREE.

And now, March 22, 1910, this cause having been heard on bill, answer and testimony, and having been argued by counsel, and upon consideration thereof, it is ordered, adjudged and decreed that the said alleged deed from said Annie E. Bentz Bixler and S. H. C. Bixler, her husband, to said George M. Heilman, Alice S. Heilman and Mary F. Heilman, dated March 26, 1908, and recorded in Deed Book, vol. 148, p. 453, in the office of the recorder of deeds for Franklin county, is fraululent, void and of no effect, and the defendants, the said George H. Heilman, Alice S. Heilman and Mary F. Heilman, are hereby directed to execute a reconveyance of the right of way over the tract of land as described therein to Annie E. Bentz Bixler, one of the above-named plaintiffs. It is further ordered, adjudged and decreed that the said alleged deed from Annie E. Bentz Bixler and S. H. C. Bixler, her husband, dated March 26, 1908, and recorded in the office of the recorder of deeds for Franklin county in Deed Book, vol. 148, p. 453, be canceled and delivered up to the plaintiffs, and that the defendants pay the costs of this proceeding. The prothonotary will enter this decree nisi, and if within ten days from this date, no exceptions be filed, the decree to become final.

*Error assigned* was the decree of the court.

*Walter K. Sharpe,* with him *Irvin C. Elder,* for appellants.—To have a deed canceled or reformed on the ground of fraud, the evidence must be clear, precise and indubitable: Cummins v. Hurlbutt, 92 Pa. 165; Rowand v. Finney, 96 Pa. 192; North v. Williams, 120 Pa. 109; Phillips v. Meily, 106 Pa. 536; McClain v. Smith, 158 Pa. 49.

The answer of the defendants is responsive to the bill and the plaintiffs are further met by the rule that "a court of equity will not give relief where the answer of the defendant expressly negatives the material allegations of the bill and the evidence of only one person without corroborating circumstances affirms what has been so negatived:" Nulton's App., 103 Pa. 286; Burke's App., 99 Pa. 350; Delaney v. Thompson, 187 Pa. 343.

The testimony of each plaintiff as to a separate transaction between such plaintiff and the defendant cannot be used each as a corroboration of the other and a case thus made out: Sower v. Weaver, 78 Pa. 443; Pioso v. Bitzer, 209 Pa. 503.

As a general rule, extrinsic evidence is not admissible to destroy the effect of an answer by impeaching the credibility of the defendant: Butler v. Catling, 1 Root (Conn.), 310; Chambers v. Warren, 13 Ill. 318; Brown v. Bulkley, 14 N. J. Eq. 294; Fant v. Miller, 17 Gratt. (Va.) 187; Powell v. Manson, 22 Gratt. (Va.) 177.

If a party who can will not read a deed put before him for execution, or being unable to read will not demand to have it read or explained to him, he is guilty of supine negligence which is not the subject of protection either in equity or law: Greenfield's App., 14 Pa. 489; Hicks v. Harbison-Walker Co., 212 Pa. 437; Coppes v. Keystone Paint, etc., Co., 36 Pa. Superior Ct. 38; Fry v. Nat. Glass Co., 207 Pa. 505.

Mere inadequacy of price is not ground for rescission of an executed contract: Davidson v. Little, 22 Pa. 245; Graham v. Pancost, 30 Pa. 89.

*Watson R. Davison,* with him *William R. Davison* and *D. Watson Rowe,* for appellees.

OPINION BY RICE, P. J., December 12, 1910:

What quantity of evidence is required to overcome a responsive answer has been variously stated. In Eaton's App., 66 Pa. 483, a leading case, it is said to be "the tes-

timony of two witnesses or of one witness corroborated by circumstances elsewhere in evidence." Other cases, in which the rule is stated in substantially the same way, are Cresson's App., 91 Pa. 168; Gleghorne v. Gleghorne, 118 Pa. 383; McGary v. McDermott, 207 Pa. 620. In other cases the requirement is said to be "the evidence of two witnesses or of one witness and strong corroborating circumstances": Eberly v. Groff, 21 Pa. 251; Pusey v. Wright, 31 Pa. 387; Delaney v. Thompson, 187 Pa. 343. In other cases the expression is, "contradicted by two witnesses or one witness and corroborating circumstances equivalent to a second witness": Sylvius v. Kosek, 117 Pa. 67; Mason v. Smith, 200 Pa. 270; Real Estate & Mtg. Co. v. Cook, 223 Pa. 158. While in still others it is said that the answer is conclusive in defendant's favor "unless it is overcome by the satisfactory testimony of two opposing witnesses, or of one witness corroborated by other circumstances and facts which give it greater weight than the answer, or which are equivalent in weight to a second witness": Burke's App., 99 Pa. 350; Galbraith v. Galbraith, 190 Pa. 225; Bussier v. Weekey, 11 Pa. Superior Ct. 463–474; Goggins v. Risley, 13 Pa. Superior Ct. 316; Story's Eq. Jurisp., sec. 1528. In McCullough v. Barr, 145 Pa. 459, after stating that relief in equity is only given where the right to it is clearly made out, Justice MITCHELL used this language: "Hence, if the facts out of which a right grows are denied by respondent under oath, there must be more than the complainant's oath to overcome it. This is the substance of the rule; and it is not to be so fettered by technical limitations as to impair its real meaning, especially since parties have been made competent witnesses, and their testimony thus put on an equality, not only as to each other, but as to other evidence." There is much force in the contention that the rule cannot be invoked by a defendant who is proved to the satisfaction of the judge sitting as a chancellor to be a person of bad reputation for veracity and not to be believed. This contention

seems to have been sustained in Miller v. Tollison, Harp. Eq. (S. C.) 145, cited in 3 Greenl. Ev. (16th ed.), sec. 289, but in several other jurisdictions it has been held to be incompetent to discredit the answer by impeaching the general character of the defendant for truth and veracity. See cases cited in 6 Am. & Eng. Dec. in Eq. 80, and particularly Brown v. Bulkley, 14 N. J. Eq. 294. There seems to be no reported case in Pennsylvania directly on the point, but it has been held that the force of the answer is weakened, if not wholly destroyed, by the contradictory evidence of the defendant given on the witness stand. "When a party is permitted to testify, and does testify in conflict with his answer, it will not do to hold that his testimony shall be disregarded and his answer stand wholly unimpeached": MERCUR, J., in Spencer & Newbold's App., 80 Pa. 317. So in Columbia Avenue Savings Fund, etc., Co. v. Lewis, 190 Pa. 558, it was said: "His (the defendant's) testimony was in a measure contradictory of his answer; not sufficiently so, perhaps, to overcome its effect as evidence, but enough to weaken its force." Whilst we are not prepared to go to the full extent of the ruling in Miller v. Tollison, Harp. Eq. (S. C.) 145, we are of opinion that where the defendant goes upon the witness stand and his credibility is successfully impeached by evidence of his general reputation for truth and veracity, the force of his answer is weakened and the rule in equity will be satisfied by the positive and satisfactory testimony of one witness to the facts essential to a decree of the relief prayed for, corroborated by other facts and circumstances which give it greater weight than the answer, even though the circumstantial evidence, standing alone, would not be sufficient to make out every essential to a decree for the plaintiff. Thus viewing the case, it is not necessary to decide that the testimony of the two plaintiffs was tantamount to more than the testimony of a single witness, or that each corroborated the other, although, speaking for myself, I think both propositions could be decided contrary to the appellant's con-

tention. Treating their testimony as that of a single witness, and assuming that, notwithstanding the successful impeachment of the defendant's character for truth and veracity, it was still incumbent on the plaintiffs to prove strong, corroborating facts and circumstances in addition to their testimony, we are of opinion that they made out a case which entitled them to the relief prayed for. These corroborating facts and circumstances are fully set forth in the findings and opinion of the learned judge below, and need not be restated by us. We think also that the learned judge has satisfactorily shown that the principle of Greenfield's Est., 14 Pa. 489, and kindred cases, cannot preclude the plaintiffs from demanding that the deed be cancelled, in view of the evidence going to show that the defendant, by his declarations and conduct, induced them to forego reading the entire deed before executing it.

The decree is affirmed at the costs of the appellant.